## JOEL M. JOHNSON and ALBERT SMITH *vs.* THE STATE.

1. If the term at which an indictment is found is stated in the caption in figures, instead of words, it is no ground for reversal or writ of error.

2. The doctrine of merger only applies where the same act constitutes both offences.

3. Where an indictment charges that the defendants at one time were guilty of conspiracy, and at another time were guilty of perjury or subornation of perjury, there is no merger.

4. If there is a conviction upon an indictment, it is no ground for reversal on writ of error, that one count charged no offence. If there is one good count, it will sustain the conviction.

5. Where two defendants, jointly indicted, are convicted, and the sentence is that one pay a fine of $250, and the other $100, "and that they

stand committed until the fine and costs of prosecution be·paid," the judgment is substantially correct, both defendants being liable for the costs, and each for his fine.

.6. Errors cannot be assigned for admitting illegal evidence, unless there is a bill of exceptions.

In error to the Supreme Court.

The facts in this case fully appear in the report of the case in the Supreme Court, 2 *Dutcher* 313.

*A. B. Woodruff* and *P. D. Vroom*, for plaintiffs in error.

*A. O. Zabriskie*, for the state.

VREDENBURGH, J.    The defendants were indicted for a conspiracy in the Bergen oyer and convicted, whereupon a writ of error was brought to the Supreme Court, when the judgment in the oyer was affirmed.    To reverse this judgment of the Supreme Court this writ of error is brought.

Twenty-two errors have been assigned.

The first assigned is that the time of the holding of the oyer in the caption is in figures, and not in words at length. But this, if any error at all, is cured by the statute.    *Nix. Dig.* 188, *pl.* 44.

The second reason assigned is that the indictment charges upon the defendants both a conspiracy and a subornation of perjury, and that the first is merged in the latter.    But the question of merger only applies when the same act constitutes both offences.    But when the indictment charges that the defendants, at one time, were guilty of conspiracy, and at another time were guilty of perjury, there is no merger.    The third, fourth, and fifth reasons are in substance that the second count of the indictment charges no offence.    If·that be so, it makes no difference.    The first one does, and that is all sufficient.    This is too well settled to require comment.    The sixth, seventh, eighth, ninth, and tenth assignment of errors are only such as are either cured by the statute above referred to, (*Nix. Dig.* 188,) or are immaterial matters.

The eleventh assignment of errors is but a variation of the third.

The twelfth assignment is not supported by the record.

The thirteenth assignment of errors is, that it does not appear by the record whether Johnson was sentenced to pay a fine of $250, and to stand committed until fine and costs were paid, or to pay a fine, and to stand committed until the fine imposed on him and Albert Smith and costs were paid. But on reference to the sentence it appears that Joel M. Johnson was sentenced to pay a fine of $250, and Smith a fine of $100, and that they stand committed until the fine and costs be paid. This is the same in legal effect as saying that Johnson pay a fine of $250 and costs, and stand committed till fine and costs be paid. The words must be read *singula singulis*. The fourteenth assignment of errors is the same, in other language, as that of the thirteenth.

The fifteenth assignment is no error, if it be as alleged.

The sixteenth and seventeenth assignment of errors are for admitting illegal evidence. But there are no bills of exceptions, and consequently cannot be considered upon a writ of error.

The other assignment of errors is substantially included and covered by the previous assignments.

I deem it unnecessary to go more into detail of these assignments. The opinion of the Supreme Court treats them very fully, and I do not see how anything more satisfactory can be said upon the subject. It may be that injustice has been done to the defendant by the verdict; but if so it is beyond our reach to rectify.

VAN DYKE, J., (dissenting.) The writ of error in this case is brought to reverse a judgment of the Supreme Court, which had simply affirmed a judgment of the Court of Oyer and Terminer and General Jail Delivery of the county of Bergen, in which the defendants were convicted of a conspiracy; and the question for us to consider is, whether there appears to be any such error or errors in the record or proceeding of the Court of Oyer

and Terminer and General Jail Delivery as required the Supreme Court to reverse, and not to affirm that judgment. If the Supreme Court ought, according to the law of the land, to have reversed that judgment for any of the reasons assigned, or which were manifest upon the record, and did not do so, it is error, and this court is called on to correct it by a reversal of their judgment.

A large number of reasons were and are assigned for the reversal of this judgment, but if any one of them is sufficient for that purpose, it will be unnecessary to examine the rest.

The objections presented, at first view, seem to be somewhat technical; but the defendants are entitled to the benefit of technicalities. As between the state and the citizen, the criminal laws are to be construed strictly as against the former, and liberally as to the latter. Every presumption is to be taken in favor of innocence, and no man is to be convicted and punished, except through a strict and rigid application of the laws for the breach of which he is made to suffer. I am aware that there is some disposition in modern times exactly to reverse these just and humane principles of the law; yet they are sustained by every reliable authority in England and America, and especially by our own statute, which preserves a clear and marked distinction, in this respect, between civil and criminal proceeding. In 1794, the legislature passed an act, still in force, respecting amendments and jeofails, which allowed a large number of errors, omissions, misprisions and mistakes, which previous to that time had been generally considered material, to be amended, supplied, or treated as of no importance; but they expressly confined all the provisions of the act to civil proceedings, and expressly declared that no part of them should extend to those of a criminal or penal nature, except only that part which requires all legal proceedings to be in the English language, leaving not only all the technicalities, nice distinctions, and strict constructions

which had previously been in operation in full force, but in express terms refused to interfere with them; and they remain so at this day, except so far as they have been modified by the act of 1855.

The first error assigned, or the first objection made to the proceedings, is that they do not appear to be in the English language. That our statute requires these proceedings to be in the English language is very certain; that they are not, that is, that they are not wholly so, is equally certain. In two places, one in the caption of the indictment, and the other in the commencement of the indictment itself, are to be found characters, understood to express ideas, which are certainly not in the English language. In both instances, the era of the world in which the indictment is found, meaning the Christian era, it is presumed, is expressed by two letters, understood to be the initial letters of two Latin words, but which do not mean anything in English. The year, too, of that era in which the indictment was found is, in both instances, described in characters not English, in letters or in words, but Arabic. The only notice taken of this objection by the Supreme Court is, that inasmuch as it could not have prejudiced the defendants in making their defence at the trial below on the merits of the case, it is cured by the statute of April 3d, 1855; but this certainly cannot be so, for if that statute, for that reason, will cure a record or indictment that is part Latin and part Arabic, it must also cure them if they are all Latin or all Arabic. But will any one insist upon this? And yet it may be said, with the same propriety in the one case as in the other, that the use of a foreign language would not necessarily prejudice the defendants in making their defence; for if they could not read it themselves, they could easily have it translated, and all they really need to know about the indictment, so far as making their defence is concerned, is to be fully apprised of the offence with which they are charged. This could be done about as well if

the indictment were wholly in a foreign tongue as if partially so. And besides, if there is any line of distinction between the two cases, whereabouts is that line? How, much of an indictment, if any, can be in a foreign language before it will vitiate it? Can it be the one-half, the one-fourth, the one-tenth, or a single sentence? Who can tell? Has the law settled it? But one answer can be given to these difficulties, and that comes up through centuries of decisions by the courts of law, declaring, with concurrent voice, that characters such as these under consideration cannot be used *at all* in such proceedings; and this necessity is made imperative by our own statute, which demands, in express terms, that *all* such proceedings shall be in the English language. It cannot be that the act of 1855, which specifies nothing, either has or was intended to have such a sweeping and potent effect as that ascribed to it; for if the doctrine be true, as contended for, then every criminal record that comes before us for review, however preposterous, absurd, or illegal it may be, or however made up of or interpolated with foreign language it may be, must be held good, unless it appears that the defendant was or might have been prejudiced in making his defence at the trial. It cannot be supposed that the legislature, by the act of 1855, intended to interfere with the substantial parts of solemn records; or to say that the courts should hold, in any case or under any circumstances, that a record of conviction was good when it was good for nothing, but it can only refer to such imperfections, omissions, and defects as have been previously considered as mere matters of form. But no error of mere form could ever prejudice a party in his defence; for every error that either does or might prejudice a party on his trial is an error of substance, and not of form merely. The error now under consideration having been always treated as a matter of substance and not of form, it cannot be considered as affected by that act. In addition to this, it seems to me

to be a sufficient answer to this view of the case to say that the act of 1855 can have no effect upon this indictment, because, at the time it was found, and when the record containing the objectionable matter was made, the act of 1855 had no existence as law in the State of New Jersey. The indictment was not only found, but the defendants were actually tried under the law as it previously stood, and the entire record was finished, except the formal entry of the judgment, before the law of 1855 came into effect, and they were entitled, at the time of their trial, to all the benefit and advantage of exception of every kind and description to which defendants were entitled, as the law then stood, and of these rights they could not be deprived by a law passed or coming into operation afterwards, and the suspension of the judgment until after the law took effect could not change their rights; and neither the Supreme Court nor this court, on a review of the matter, can lawfully give a different judgment, because they hear the matter after the law has been changed, from what they should have given if they had heard it before the law was changed. To do this, would be making the act an *ex post facto* law of the most oppressive kind, for it not only deprives parties of the benefit of the law, as it stood at the time of doing the act complained of, but also as it stood at the time of their trial. And it could not be more objectionable, or more unconstitutional, if the legislature had made the offence itself indictable after it had in this case been committed. Now, when the Supreme Court decided that this error was cured by the act of 1855, I understand them to concede that the error would have been fatal but for that act. If they did not so intend, they must have intended to array themselves not only against a former solemn decision of the Supreme Court, but also against the decision of the Court of Appeals, for this question has been settled for the last ten years in this state, by the decisions of both these courts.

The case of The State *v.* Berrian was removed by writ of error into the Supreme Court, and was there elaborately argued and very ably examined and decided by the court, in which this question was directly and distinctly raised, and was the only one on which the reversal took place. The court were unanimous in their opinion that figures and characters, such as those now under consideration, were improper and unlawful in an indictment. Justice Nevius, while he assented fully to the principle, thought it did not properly apply to the case then before them; but the application of the principle to that case, which was extremely technical, shows with what determination the courts have always adhered to the strict rule. The cause was removed into the Court of Errors and Appeals by the state, and again elaborately argued, and the judgment of the court below affirmed unanimously, as we learn from the report on the point under consideration. As a general rule, I am forced, therefore, to consider the question as settled in this state against the legality of such a record as this, and, with such settlement under the law, I can see no reason to interfere.

But it is said that this error does not occur in a material part of the record. I cannot think so. It occurs both in the caption and in the indictment. The caption is an all-important part of this record. It is the caption which shows the court in which the indictment was found; and if it did not show the court at all, or if it contained the name or structure of a court which had no jurisdiction over such an offence, and in which no such indictment could be presented or found, beyond all question, the record would be bad, and the judgment rendered on any conviction in such case should be reversed. The caption, therefore, is a necessary and material part of the record; and it is equally true that the error occurs in an important and material part of the caption. It occurs in that part of it which sets forth the year in which the indictment was found. This is material, and it is not found in

any other part of the record. It is material, for if it appeared by the record that the indictment was found ten years, or a less number, after the time stated in the indictment, when the offence was committed, it would appear on the face of the record that the crime or complaint was barred by the section of the act which limits the time to two years, in which all such presentments must be made or such indictments found. This, I apprehend, would be fatal to the record, or if not of itself fatal, it certainly could not be properly contended that the *time* when the indictment was found was an unimportant, immaterial, or mere formal part of the record. It occurs in this case in an infinitely more important part of the record than in the case of The State *v.* Berrian. There it occurred in copying into the indictment a *fac simile* of the affidavit on which the perjury in the case was assigned, indicated clearly enough by the form and structure of the affidavit itself, as well as by its being enclosed by the usual quotation marks. The justice of the peace before whom that affidavit was taken, in reducing it to writing, in reciting the day and year in which it was taken before him, named the year in Arabic figures. Also, in the body of the affidavit, after the words " being duly sworn, on his oath saith," &c., in giving the time which the defendant in that case fixed as the one when the offence of which he complained had taken place, the justice again used Arabic figures; but the last and important of these two dates was also accompanied by an innuendo, added · in a parenthesis by the grand jury, or its draftsman, which declared, in words at length, that the last-named figures meant the year of our Lord one thousand eight hundred and forty.

If, then, we can imagine a case where the use of figures in a criminal record would be deemed immaterial, it would seem to be the case of The State *v.* Berrian. And besides, it might with much propriety in that case have been contended, as it was by Justice Nevius, that the rule that requires or permits a *fac simile* of forged or counter-

feited papers to be set forth in an indictment should be applied to the case of Berrian. Yet the Supreme Court, in that case, held that Arabic figures, thus used, were fatal to the proceeding; and this decision, so far as the use of figures is concerned, was unanimously affirmed by the Court of Errors and Appeals.

The authority, then, of that case, as well as the numerous authorities therein cited, together with others not cited, I consider as settling the law on the subject, in this state at least.

It is also objected to this record, that while it contains an indictment and conviction for a conspiracy merely, it at the same time discloses and charges the commission of a crime of much greater magnitude, viz., perjury and subornation of perjury, and that, as a consequence, the lesser offence is merged in the greater, and that an indictment for the lesser, which contains on its face an allegation and charge showing the commission of the greater, is bad, and will not be sustained. Such has doubtless long been the law, and it should be applied to this case, if it comes within the principle. The law in this respect rests, I presume, on the very well-established principle that a person cannot be twice tried for the same offence, and it would be unjust to the public, and contrary to its policy, to permit a person to be indicted and convicted of some small offence which might be carved out of some particular transaction involving crime of the very highest grade, and thus escape almost entirely the punishment to which by the law he was amenable.

It seems to be very well settled in practice, that if a person is indicted for one offence, and the evidence on the trial should clearly show that he had been guilty of one of a much higher nature, he must be acquitted of the lesser offence of which he happens to be then on trial. And so, too, if a person be indicted for a comparatively trivial offence, and the indictment itself contains on its face statements and charges which show that a crime of a

much higher nature has been committed, the indictment itself will be bad; for instance, if a person were indicted for an assault and battery, and on the trial it should clearly appear that, in committing the assault and battery charged upon him, he had actually committed a rape, or perpetrated a felonious homicide, he could not be lawfully convicted of the assault and battery. So, too, if the indictment itself contained the charge that the defendant unlawfully, &c., made the assault, and then and there did beat, wound, and *kill* the party on whom the assault was alleged to have been made, the indictment certainly could not be permitted to stand as one for an assault and battery merely, for the very obvious reason that it contained a charge of a much higher nature, as a part of the transaction on which the party should have been indicted.

So, too, if several persons were indicted for a conspiracy, and the charge was, that wickedly devising and intending to steal the goods and chattels and money of one A B, they did corruptly and unlawfully conspire and agree together to steal from the said A B his said goods and money; and that, in furtherance of their conspiracy, they did, on a certain day named, unlawfully and willfully assassinate and kill the watchman who had charge of the said goods and money, and did thereupon, in the accomplishment of their conspiracy aforesaid, then and there take, steal, and carry away the said goods, chattels, and money of the said A B aforesaid, specifying everything with sufficient exactness, to the evil example of all others, &c., and contrary to the form of the statute, &c. It is impossible to suppose that such indictment for *conspiracy* could be sustained simply because it in fact contained the triple charge of conspiracy, larceny, and felonious homicide; and conspiracy being the least of the three, would be considered as merged in the greater offence; and even if the indictment had been for the larceny, it would be bad, because containing the charge of felonious homicide; the larceny, although itself a felony, being of

a much lower grade of crime than the homicide, would be merged therein. This general doctrine is sustained by authorities almost without end, and the question touching this part of the case is, whether this law applies to the case before us. This indictment charges, and is for a conspiracy, and it also charges that in the act of carrying out and committing that conspiracy, the defendants, on the day and at the place mentioned, did, before one H. I., then being one of the justices of the peace of said county, cause and procure the said Susan Ann Smith, upon and *by her oath*, falsely to charge that the said William Parker was the father of the bastard of which she alleged herself to be with child. This is just such an oath if true, as an unmarried woman in that condition has a right to make; but the oath is charged to be false, and the conspiracy to bring it about is charged to be unlawful and corrupt. If, then, this statement is to be taken as true, then the defendant, Susan Ann Smith, who took the oath, is charged with perjury, and the other defendants, who it is alleged procured that perjury, are charged with subornation of perjury, which in the eye of the law stands on the same footing. If, then, perjury be a crime of a much higher grade and of much more heinous character, and requiring and carrying with it a much greater amount of punishment than a conspiracy to extort money, both being charged in this indictment, the rule will apply, and the lesser offence will be merged in the greater.

It is not necessary, in the solution of this question, to determine whether perjury be a felony or not. It probably is not, and it is equally probable that we have no such thing as felony in this state. Treason, it has been said, is not felony, but a grade of crime by itself. All crimes, it is contended, are divided into three classes, treasons, felonies, and misdemeanors. All the crimes known to our law, that have been classified at all by any of our statutes, are misdemeanors and *high* misdemeanors. Conspiracy is classed with the former, perjury with the latter. We

Johnson v. State.

have also in this state, as is well known, a class of offences triable and considered by common consent, as well as by certain features which characterize them, as crimes of the highest grade. They are not bailable, except before a justice of the Supreme Court. They can only be tried before the Oyer and Terminer and General Jail Delivery. The parties charged are entitled to twenty peremptory challenges, to a copy of the indictment, and a list of the jury two days before trial. We have also another class of offences, as well known as lesser offences, which cannot claim any of the advantages above mentioned. Conspiracy belongs to the latter class, perjury to the former. Perjury has always been considered a crime of great enormity, and in one of its aspects carries with it a more terrible punishment than any other. I think, therefore, that the difference in the magnitude of the two offences of conspiracy and perjury is so great that, when both are charged to have been committed in the perpetration of the same offence, the lesser is merged in the greater, and consequently an indictment for the lesser offence, which shows on its face the commission of the greater, is bad.

If a conspiracy will not merge in perjury, which is alleged to have been committed in perpetrating the conspiracy, for the reason that perjury is not felony, then it would not merge in treason, which is not felony; nor would an assault and battery merge in homicide because it is not felony here.

The doctrine of merger in such cases is by no means a quibbling one. It is very important to preserve and enforce the principle. Why should two or more persons, who have actually committed burglary, robbery, arson, or murder, be indicted and tried simply for a conspiracy to commit such offences? Every one of the higher offences committed by two or more persons necessarily involves the crime of conspiracy to do the act. Every conspiracy to commit a crime is indictable, whether the crime be committed or not; and in such case it is neither necessary

nor proper to charge or prove that the offence was actually perpetrated as contemplated, only that the defendants conspired to do it. When the thing to be accomplished by the conspiracy is not of itself a crime, it is held to be necessary to charge and prove that the conspiracy was actually carried out. When there was nothing but a conspiracy to commit a crime, the parties should be so charged ; but in every . case where the conspiracy is to commit a high offence, and it is actually committed, and in every unlawful conspiracy to do a thing not in itself criminal, but in the perpetration thereof the parties commit a high crime, it is manifestly improper, and I think unlawful, to permit the high offence to be passed over, and the lesser one of conspiracy adopted in its stead ; and whenever such state of things appears on the face of a single count of the indictment for the lesser offence, it should be arrested. Nor is it any sufficient answer to this to say that it is an error in favor of the defendants, and that they should not be permitted to take advantage of it. Defendants, it is to be presumed, neither find nor prepare the indictments, and are in no way responsible for their imperfections ; but they have a perfect right to avail themselves of any defect or illegality therein, whether it be the result of accident, mistake, or design.

It is also objected that the judgment itself in this case is erroneous. If a judgment that is indefinite, uncertain and absurd is necessarily erroneous, then this is so. The judgment declares that Joel M. Johnson shall pay a fine of $250, and that Albert Smith shall pay a fine of $100, and that they stand committed until the *fine* and costs of this prosecution be fully paid. It seems to me to be impossible to determine with any certainty what this means or how it is to be executed. It is neither a joint judgment nor a several judgment, but appears to partake of the nature of both. In imposing different and apparently separate fines on each, it seems as if the court must have intended the judgment to have been several, and that each

Johnson v. State.

was to suffer or pay the penalty imposed on him separately, and when done to be discharged; but when the court go further, and put, as it were, these two fines together, and call it *a fine*, and declare that both the defendants shall stand committed until such fine and the costs of prosecution be *fully* paid, they make it a joint judgment, and make each defendant responsible for the fine of the other, as well as his own, in addition to the costs, because, by the terms of the judgment, they cannot be discharged from imprisonment or from the custody to which they have been committed until the entire judgment is satisfied. If the two defendants had been able and willing, when the judgment was pronounced, to pay each the fine that seems to have been imposed on him, with the costs, they might have been discharged; but if Johnson had been unwilling or unable to pay any part of his fine or costs, could Smith, by paying the $100 fine, imposed on him, and the costs, or the half of them, or some other part of them, have been discharged from custody, leaving the fine of $250, imposed on Johnson, unpaid? Such may have been the intention of the court, but it is not so expressed in the sentence; on the contrary, it is in terms expressed the other way; and it is difficult to see how the sheriff or other officer could have been safe in discharging either until the whole of the fine should be paid; and it is almost as difficult to hold the officer justified in continuing either of them in custody after the payment, or tender of either of them of the amount of fine imposed on him individually, together with the costs. This judgment, then, is uncertain, indefinite, and inconsistent, and is such a one as no court should, I think, pronounce sufficient and correct.

Several other errors have been assigned for the reversal of this judgment: some of them involve questions of much importance; but as the discussion of them is not necessary, in my opinion, to the decision of this case, I have not deemed it necessary to consider them. I think,

therefore, that for the reasons mentioned, without considering others, this judgment should be reversed.

*For affirmance*—The CHIEF JUSTICE, and Judges VREDENBURGH, CLAWSON, COMBS, CORNELISON, SWAIN, and WOOD.

*For reversal*—Judges VAN DYKE and KENNEDY.